Eunice L. SWANSON, individually and as Guardian ad Litem of Michael R. Swanson and Franklin R. Swanson, minors, Plaintiffs.

v.

UNITED STATES of America, Defendant.

No. 40167.

United States District Court
N. D. California, S. D.

Jan. 6, 1964.

Ryan & Ryan, Thomas C. Ryan, San Francisco, Cal., and George E. Dilley, Santa Rosa, Cal., for plaintiffs.

Cecil F. Poole, U. S. Atty., Robert S. Marder, Asst. U. S. Atty., San Francisco, Cal., for defendant.

ZIRPOLI, District Judge.

This is a civil action brought by Eunice L. Swanson, individually, and as Guardian ad Litem of Michael R. Swanson and Franklin R. Swanson, minors, against the United States under the provisions of the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. The plaintiffs seek to recover damages for the wrongful death of their husband and father, Franklin R. Swanson, Sr., killed on March 22, 1961 in the crash of an Air Force Lockheed Constellation (C–121) at Gridley, California. Mr. Swanson, a technical representative of the Lockheed Aircraft Corporation, was stationed at McClellan Air Force Base near Sacramento, California. The crash, which left no survivors, occurred while the plane was making a flight which had for its purpose a maintenance check and the testing of a modification in the elevator control mechanism of the tail assembly.

The elevator mechanism is functionally similar to the rudder, except that instead of being used to change the direction of the plane, it is used to change altitude. The pilot alters the angle of the elevator by means of an hydraulic and electrical system. If the pilot changes the angle of the elevator so that it

forms an angle above the horizontal, the plane will ascend; if he changes it to form an angle below the horizontal, the plane will descend.

The modification was an attempt to provide a "fail-safe" system in case the normal system failed. The modification would not be in use during normal flight, but in case of an emergency, the pilot could switch to the modified system, hence the name "fail-safe".

The flight plan for the test flight called for a two hour flight. The pilot was to proceed immediately after take-off to an altitude of 15,000 feet to begin testing. The plane took off according to plan. No radio communications were established between the plane and the ground during the testing. One hour and forty-two minutes after take-off, the plane crashed. No one survived. Ground witnesses estimated that the altitude of the plane was between 2,000 and 3,500 feet when the plane nosed over suddenly and dove to the earth.

There are three principal issues before the Court:

(1) Is the Court without jurisdiction because the acts complained of come within the discretionary function exception to the Court's jurisdiction pursuant to 28 U.S.C. § 2680(a)?

(2) Have the plaintiffs proven that the proximate cause of Swanson's death was due to negligence of the defendant?

(3) Was there such an assumption of risk on the part of Swanson as to preclude recovery by plaintiffs?

For the reasons hereinafter stated, the Court concludes:

(1) That the discretionary function exception to its jurisdiction does not apply;

(2) That the doctrine of res ipsa loquitur applies to the facts proven in the instant case, and that the most reasonable inference which can be drawn from all the proven probabilities points to negligence of the defendant as the proximate cause of the crash and Swanson's death;

(3) That the evidence fails to prove that Swanson had such actual knowledge of the specific danger involved as to constitute an assumption of risk.

## JURISDICTION OVER THE SUBJECT MATTER: THE DISCRETIONARY FUNCTION EXCEPTION.

Jurisdiction in this matter is based on 28 U.S.C. § 1346(b), and the Tort Claims Act, 28 U.S.C. § 2671 et seq., which provides that the federal courts shall have jurisdiction of cases against the government for the negligent acts or omissions of its agents and employees.

The government contends that this case falls within the exception to the Tort Claims Act for conduct involving the exercise of a discretionary function. The relevant code section, 28 U.S.C. § 2680(a), provides in pertinent part, as follows:

"The provisions of this chapter and section 1346(b) of this title shall not apply to—

"(a) Any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

In defining the meaning of "discretionary function", the Supreme Court in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), adopted a distinction between decisions made on the "planning level" and those made on the "operations level". Although portions of the Dalehite opinion are no longer controlling, see Rayonier, Inc. v. United States, 352 U.S. 315, 319, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), the planning level-operations level distinction has been adopted by several circuits. United States v. Hunsucker, 314 F.2d 98 (9th Cir., 1962); American Exchange Bank of Madison, Wisconsin v. United States, 257 F.2d 938, 78 A.L.R.2d 879 (7th Cir., 1958); Eastern Air Lines v. Union Trust Company, 95 U.S.App.D.C. 189, 221 F.2d 62 (1955).

In a strict sense, every action of a government employee, except perhaps a conditioned reflex action, involves the use

of some degree of discretion. The planning level notion refers to decisions involving questions of policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy. For example, courts have found that a decision to reactivate an Air Force Base, United States v. Hunsucker, supra, or to change the course of the Missouri River, Coates v. United States, 181 F.2d 816 (8th Cir., 1950), or to decide whether or where a post office building should be built in Madison, Wisconsin, American Exchange Bank of Madison, Wisconsin v. United States, supra, are on the planning level because of the necessity to evaluate policy factors when making those decisions.

The operations level decision, on the other hand, involves decisions relating to the normal day-by-day operations of the government. Decisions made at this level may involve the exercise of discretion but not the evaluation of policy factors. For instance, the decision to make low level plane flights to make a survey, Dahlstrom v. United States, 228 F.2d 819 (8th Cir., 1956), or the operation of an air traffic control tower, Eastern Air Lines v. Union Trust Co., supra, or whether a handrail should be installed as a safety measure at the United States Post Office in Madison, Wisconsin, American Exchange Bank of Madison, Wisconsin v. United States, supra, involve the exercise of discretion but not the evaluation of policy factors.

The discretionary function exception applies when the plaintiff claims that conduct at the planning level is the cause of his injuries. Conversely, the exception does not apply when the plaintiff complains of conduct at the operations level, even though such conduct is required for the execution of a planning level decision. For example, in United States v. Hunsucker, supra, the plaintiff complained of negligent failure to provide the proper drainage from an Air Force Base, which resulted in damage to the plaintiff's adjoining land. The failure to provide adequate drainage was one of many construction activities involved in reactivating Oxnard Air Base in California. The Court of Appeals for the Ninth Circuit held that the discretionary function exception did not apply because the plaintiff claimed that the wrongful act was the failure to provide adequate drainage, rather than the decision to reactivate the Air Force Base. On the other hand, in Coates v. United States, supra, the plaintiff alleged that the decision to change the course of the Missouri River was the negligent conduct, rather than alleging negligence in the day by day construction of the change. Consequently, the Court applied the discretionary function exception.

In the present case, the test flight was the final step of a Material Improvement Project, initiated by Headquarters, Military Air Transport Service (MATS) to develop a fail-safe system for the elevator mechanism of the C–121. MATS, by letter of May 29, 1959, requested the opening of the project by the Sacramento Air Materiel Area. The project was forwarded through the engineering organization at McClellan Field to the In-Service Engineering Department, where it was assigned to a project engineer, Roy Kurosawa. Kurosawa developed a design which was subsequently subjected to two bench tests and a ground test before the fatal flight test. After all testing had been completed, the "complete engineering package" was to be submitted to the Air Force Configuration and Control Board for approval. At the time of this project, 50 to 60 engineering projects a year regarding airplane modifications and maintenance were in progress at McClellan Field; however, only three or four per year required test flights.

At this juncture it is appropriate to note what the plaintiffs are contending and what they are not contending. The plaintiffs claim that the Government was negligent either in the method of designing or the method of installing the modification. They do not contend that the decision of MATS to develop the failsafe system was the negligent act.

In reply the Government urges for consideration the following three cases: Toledo v. United States, 95 F.Supp. 838

(D.Puerto Rico 1951); Barroll v. United States, 135 F.Supp. 441 (D.Md.1955); and Bartholomae Corp. v. United States, 135 F.Supp. 651 (S.D.Cal.1955).

In the Toledo case, the plaintiff sued for damages to his parked automobile when a tree that had rotted fell on it. The tree was one of several tropical trees involved in an experimental project conducted at the United States Experimental Center in Puerto Rico. The District Court concluded that the experimentation was an exercise of a discretionary function. The difficulty with the Toledo case is that it was decided prior to the development of the planning and operations level analysis announced in the Dalehite case. This Court is of the opinion that the Dalehite distinction and developments subsequent to Dalehite, such as United States v. Hunsucker, supra, in this circuit, cast serious doubt on the reasoning of the Toledo opinion.

Barroll v. United States was a suit for damages to plaintiff's house from falling plaster allegedly caused by the firing of 280 millimeter cannons at the Aberdeen Proving Grounds in Maryland. The Court specifically found no negligence in the conduct of the test. It held that the decision regarding the selection of a test site would be a discretionary function, and hence the plaintiff could not base liability on that ground. This case is of little help here because the plaintiffs are not claiming that the decision to modify the C–121 was the wrongful act.

Bartholomae Corp. v. United States was a claim for property damage caused by the detonation of atomic weapons as part of a test series at the Nevada Proving Grounds. The Court found that the plaintiff failed to establish negligence as required by the Tort Claims Act. The Court further held that the action was precluded by the discretionary function exception. But, on appeal the Court of Appeals for the Ninth Circuit refused to pass on the question of the discretionary function exception on the ground that such an inquiry was unnecessary, since the District Court was not in error when it concluded that negligence had not been established. Bartholomae v. United States, 253 F.2d 716, 720, 73 A.L.R.2d 1293 (9th Cir., 1958). This Court does not feel that Bartholomae is good authority because the discussion of the discretionary function exception was not the turning point of the decision and because the dissimilar circumstances of atomic blasting and the modification involved here do not entail the same considerations.

The Court is bound to adopt the analysis of the Ninth Circuit in the Hunsucker case. The decision of Headquarters, MATS, to develop a fail-safe modification of the C–121 was a decision at the "planning level" because it involves the weighing of policy factors, such as the need for a fail-safe device and the financial feasibility of developing it. But the plaintiffs are not contending that the decision to develop the modification is the wrongful act; rather they are contending that the Government was negligent in the manner in which the modification was designed or installed. Just as in Hunsucker, where the failure to provide proper drainage was at the operations level even though necessary to the execution of a planning level decision, the alleged negligence here in the mechanics of designing and installing the modification was at the operations level, even though necessary to the execution of a planning level decision. Therefore, the discretionary function exception of 28 U.S.C. § 2680(a), does not apply, and the Court has jurisdiction over the subject matter of the action.

### PROOF OF NEGLIGENCE.

In determining applicable rules of negligence, the federal court in a Tort Claims case must refer to the law of the place where the alleged wrongful act or omission occurred. 28 U.S.C. § 1346(b), Richards v. United States, 369 U.S. 1, 7, 82 S.Ct. 585, 7 L.Ed.2d 492. The California rule is that "The general test of negligence is foreseeability; i. e., conduct is negligent where some unreasonable risk of danger to others would have been foreseen by a reasonable person." Witkin, Summary of California Law, Vol. 2 Torts, page 1404.

The plaintiffs' evidence is directed to showing that the United States was negligent in failing to use a skilled hydraulic mechanic or engineer to work out the design or supervise and check the work of the project engineer, Roy Kurosawa. Additionally, the plaintiffs attempted to show that certain wiring connecting the modification with the instrument controls in the pilot's section was exposed, so that someone could have tripped on it, thereby causing a break in the wire.

■ Relying upon California law, plaintiffs in their effort to establish such negligence, asserted two theories of liability, one based upon evidence of specific acts of negligence, and the other based upon the res ipsa loquitur doctrine. In a case such as this where the exact cause of the crash of the C–121 is unknown, plaintiffs' bifurcal approach has merit. It gives the trier of the fact all available evidence which might be useful and relevant to a proper determination of the case. Thus, even though there is no direct evidence from which the Court can find that plaintiffs have sustained the burden of proving that the actual cause of the crash resulted from specific acts of negligence of defendant, it may, nevertheless, apply the doctrine of res ipsa loquitur if the facts and circumstances of the case raise a reasonable inference that the defendant must have been negligent. See Di Mare v. Cresci, (1962) 58 Cal.2d 292, 299, 23 Cal.Rptr. 772, 373 P.2d 860.[1] Also see Blumenthal v. United States, D.C., 189 F.Supp. 439, 447.

The best statement of the res ipsa loquitur doctrine as applied in California appears in the case of Zentz v. Coca Cola Bottling Co., (1952), 39 Cal.2d 436, 247 P.2d 344, wherein the Court said:

"[R]es ipsa loquitur applies where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied both upon common knowledge and the testimony of expert witnesses, and they have considered the circumstances relating to the accident in each particular case, such as the extent of control exercised by the defendant, the plaintiff's own conduct, the likelihood of negligence by some third person, and, in some situations, evidence that the defendant is better able than the plaintiff to explain what happened. All of these matters have been treated as aids to help the courts in determining whether the accident was of such a nature that *the injury was more probably than not the result of the defendant's negligence.*" (p. 446 of 39 Cal.2d, p. 349 of 247 P.2d) (Emphasis supplied).[2]

1. To the degree that the language of the Court in Johnson v. Western Air Exp. Corp., 45 Cal.App.2d 614, 631, 114 P.2d 688, may appear to be contra, it is no longer controlling in view of the clear language of the Supreme Court of California in Di Mare v. Cresci, supra. See also Leet v. Union Pac. RR. Co., 25 Cal.2d 605, 155 P.2d 42, 158 A.L.R. 1008.

2. See also Roddiscraft, Inc. v. Skelton Logging Co., (1963) 212 Cal.App.2d 784, 793, 28 Cal.Rptr. 277, 282, wherein the Court said:
"The doctrine of res ipsa loquitur is now firmly ingrained in California negligence law. Stripped of its Latinity res ipsa loquitur is a rule of law which authorizes an inference of negligence *in the absence of a showing to the contrary.* (Zentz v. Coca Cola Bottling Co., 39 Cal.2d 436, 440, 247 P.2d 344; Witkin, Calif. Evidence, § 62, p. 81; § 74, p. 96; § 77, p. 99.) Its effect, where applicable, is to declare that from the happening of the accident in question an inference arises that the proximate cause of the occurrence was some negligent conduct on the part of the defendant. * * * Before the doctrine may be applied, however, the following requisite conditions must be met: (a) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (b) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (c)

Although there appear to be many possible causes of the crash, but no direct proof of the specific cause, the only reasonable inference the circumstantial proof will permit is that the crash was caused by the adverse effect of the modification on the normal hydraulic control system. Furthermore, this circumstantial proof compels the inference that the adverse effect of the modification on the normal system was caused by the failure of senior engineers to properly supervise and check the work of the project engineer, Roy Kurosawa.

At the time of the crash, the plane was no longer engaged in testing maneuvers, was engaged in a routine flight back to McClellan Air Force Base, and was approximately 50 miles therefrom. This flight, while in a sense a testing flight, was, nevertheless, deemed routine, and particularly so at the time of the crash. Harry L. Bowman, military crew chief and chief flight engineer for this plane, testified that he considered this flight to be a routine flight, that the pilot was "routinely returning" from a straight flight after testing, and that since there was no radio contact with the ground, he would assume that the flight had been normal in every respect up to the time of the crash.[3]

The maintenance testing and the testing of the modification were to take place at an altitude of 15,000 feet. At the time of the crash, the weather was clear and ideal for flying. The plane had been out one hour and forty-two minutes on what was to have been a two-hour flight and was flying at an altitude of from 2,000 to 3,500 feet, and at a speed anywhere from 170 to 200 miles an hour, when suddenly it nosed over and went into the ground at an angle of 60 to 65 degrees. Up until the point of the nosing over, there apparently was nothing wrong with the

---

it must not have been due to any voluntary action or contribution on the part of the plaintiff. * * * When these basic conditions exist the rule of res ipsa loquitur comes into play and *an inference of negligence on the part of the defendant is raised.*" (Emphasis supplied.)

The doctrine has been applied to airplane crash cases brought in federal court under the Federal Tort Claims Act. See United States v. Johnson, 5 Cir., 288 F.2d 40; O'Connor v. United States, 2 Cir., 251 F.2d 939; United States v. Kesinger, 10 Cir., 190 F.2d 529; Blumenthal v. United States, D.C., 189 F.Supp. 439; Norden v. United States, D.C., 187 F.Supp. 594; Schneider v. United States, D.C., 188 F.Supp. 911; D'Anna v. United States, 4 Cir., 181 F.2d 335; Rogow v. United States, D.C., 173 F.Supp. 547, 555; Sapp v. United States, D.C., 153 F.Supp. 496; Des Marais v. Beckman, 13 Alaska 745, 198 F.2d 550. For cases where the court found no experience of safety or pattern of regularity to justify the application of res ipsa loquitur, see Williams v. United States, 5 Cir., 218 F.2d 473, 476; Cohn v. United Airlines, D.C., 17 F.Supp. 865; Ray v. United States, 5 Cir., 228 F.2d 574, 581.

3. Harry L. Bowman testified:
"Q. Will you state your opinion, what was Major Davidson (the pilot) doing with regard to the operation of the air-

plane immediately prior to the fatal crash?
"A. I would say he must have been returning to McClellan.
"Q. What is your opinion with regard to whether he was engaged in any testing of the aircraft at that time and at that level of flight?
"A. I'm sure he wouldn't have been.
"Q. You think he was then just routinely returning from a straight flight after the testing?
"A. Right." (Tr. 473–474).
Lynn Pursell, an aeronautical engineer in the employ of defendant testified:
"The Court: Basically this is sort of a routine thing, isn't it?
"The Witness: This is correct.
"The Court: So there was nothing particularly special about this flight?
"The Witness: No." (Tr. 192)
Neil D. Graham, a mechanical engineer in the employ of the government testified:
"Q. Assuming that the pilot on this flight followed his instructions, that is, the test had to be made at 15,000 feet. Assume that he was flying at 3,500 feet and he was on his way back to the base, pointed, going south toward the base. If the pilot followed all of the instructions and everything was all right, he would be then simply engaged in a routine flight in a Constellation, wouldn't he?
"A. Yes, sir, I guess so." (Tr. 303–304)

flight. This is borne out by the fact that the plane had no radio contact with the field, a contact which would have been made had there been any trouble. The operators of the plane were very experienced and highly capable. The aircraft, with the exception of the modification, was in excellent condition on the day of the crash, and in the best condition it was ever in since it was picked up at McClellan (Tr. 394–395; 454). It had been successfully operated over a period of five years, had been flown around the world and made several trips to South America.

In trying to determine the cause of the crash, the experts eliminated pilot error, fuel shortage, propeller failure, engine failure, wing collapse, and every other probable cause of the crash, except malfunctioning of the tail assembly. The evidence discloses that the possible causes of the malfunctioning of the tail assembly are (1) negligence in the reassembly of the component parts of the tail assembly, or (2) defective wiring for the modification, or (3) negligence in the design or installation of the modification.

Both improper reassembly and defective wiring can be eliminated as likely causes of the malfunctioning of the elevator in the tail assembly.

The evidence discloses proper care in the reassembly of the tail assembly, and such care is corroborated by the fact that portions of the aircraft found after the crash disclosed that there was no linkage separation in the tail assembly. The wiring for the modification, while "laid in an 'un-air force' manner" and intended only for temporary use, was nevertheless safe. It was laid inside corrugated indentations in the floor of the main section and taped at intervals to prevent it from coming out of the indentations. All of the experts agreed that the indentations were of such a width and depth that a man could not put his foot into the indentation to break the wire without a designed effort. Rinella, the inspector assigned to inspect this plane before the flight, testified that he had inspected the entire plane, except the modification, which he was not permitted to inspect, that the plane was in "the best condition since we picked it up" (at McClellan in 1954), and that as to the cause of the crash that the modification was always "suspect" in his mind. This suspicion on his part was confirmed by the experts, Bowman, Snider, Pursell, and Graham,[4]

4. Bowman testified:
   "A. One would have to assume that the aircraft went into a dive and he couldn't get it out. Something must have happened in the tail assembly.
   * * *
   "The Witness: That would be actually a pretty broad statement. It could be other things, also, but when an airplane noses over, the tail—the elevator has to move to cause this, unless it loses power and stalls out. And when it's in a dive it wasn't spinning, evidently, from all the reports, so it must have been caused due to something in the elevator system. That would be the only—I don't know how else you could look at it.
   "The Court: That's the only cause you could attribute for this type of a nose-dive?
   "The Witness: Personally, yes, sir." (Tr. 475–476)
   Snider testified:
   "The Witness: Certainly, all the testimony to date—all the evidence to date, I should say, that I have seen dealing with this crash, I think tends to point out that there was something happened to the elevator control surface, but beyond this, I think anything beyond that would be guesswork on my part. As far as—
   "The Court: You are able to express that opinion, that it would relate to the elevator control surface?
   "The Witness: Yes, sir." (Tr. 802–803)
   Pursell testified at the Collateral Board hearing and reaffirmed at the trial:
   "Q. Do you feel then that this modification as applied to this aircraft was not the cause of this accident?
   "A. I don't know. A failure in a normal system and a failure in this system (modification) in combination could have caused the accident." (Tr. 115)
   Graham testified:
   "A. * * * If I observed any Constellation in level flight and it nosed over and went straight into the ground, my first guess as to the problem would be a control malfunction.
   "Q. That would be a malfunction in the elevator control?
   "A. Very probably." (Tr. 250)

who were of the opinion that the modification caused a malfunctioning of the elevator, which in turn caused the crash.

The only remaining inference is that the modification was designed in such manner that when installed, it affected the normal system in some way (probably a leakage, as occurred in the first ground test on a plane at Charleston, when only one valve and not two as in the fatal flight test, was used). The hydraulic principles involved were not complex, and the normal system had functioned successfully in the past. Consequently, a *carefully* designed modification would not have an adverse effect on the normal system, and therefore the doctrine of res ipsa loquitur establishes a permissible inference of negligence. The burden then shifts to the defendant to destroy this inference.

Defendant, to offset this inference of negligence, contends that the evidence discloses that the modification was designed to function as a "redundancy", an auxiliary or third system, as it were, having no adverse effect on the existing Lockheed elevator control system; that the modification was necessary "unless some positive way could be found to eliminate failures or maintenance errors in the parallelogram" (the elevator mechanism); that Kurosawa's modification aided the movement of the elevator; that the aircraft and tail assembly was in excellent condition immediately before the fatal flight; that the bench check and the ground check of the modification had been successful; that Kurosawa was a competent engineer, with adequate hydraulic engineering experience; that Kurosawa's work was supervised by Konvalin, his technical consultant, who had fifty to eighty meetings with him, and by Graham, who later became his Group leader; that the installation was a simple one, and "did not involve the basic design of the complete hydraulic system"; and that by reason of the foregoing, no unreasonable risk to the elevator control malfunction (or any other system failure) could have been foreseen by a reasonable person in the exercise of ordinary care, and hence no specific negligence can be imputed to defendant.

The Court is not satisfied with the defendant's interpretation of the evidence. To say that the modification was "designed to function as a 'redundancy', having no adverse effect on the existing Lockheed elevator control system", and that "the installation was a simple one and 'did not involve the basic design of the complete hydraulic system'" is an oversimplification and not entirely accurate. The modification was in fact built (and designed to be built) into the normal existing system, and the two added valves and the added tubing in the modification had a very definite effect on the pressure and flow of the hydraulic fluid. Whether such effect was detrimental was the basic fact to be tested out. In so doing, it cannot be said that the defendant, considering the danger to be avoided and the consequences that might reasonably be expected, exercised such care as would be required of an ordinarily prudent person under like circumstances. True, there was testimony that Kurosawa was a competent engineer, that he consulted with Konvalin and Graham, that a bench check and ground check were made, but the fact remains that neither Konvalin nor Graham were cognizant of the actual details of Kurosawa's modification or the mathematics and figures that were used to determine the pressure, time and fluid flow changes resulting from the modification. Furthermore, Konvalin had no real detailed knowledge of the workings of the two added valves, for he testified:

"Q. But once it (valve K–4) is closed, then the power is cut off. Would it open automatically?

"A. I am not sure on this. I will say that it is normally open.

"Q. But the answer is you do not know whether it would automatically open?

"A. This is right.

"Q. Also, with regard to KO2, once that was closed would that open automatically or would it remain shut after the power had been taken off?

"A. I do not positively know on that either." (Tr. 213–214)

Again, Konvalin testified:

"Q. Mr. Konvalin, do you recall whether or not at any time you computed the internal capacity of K–4?

"A. Fluid capacity?

"Q. Pardon me?

"A. You are referring to the fluid capacity?

"Q. Yes, the fluid capacity.

"A. I do not myself, no.

"Q. Do you recall at any time examining any statistics or data or figures wherein that had been computed by anyone?

"A. I will say that Mr. Kurosawa did not compute the relative time that it would take to transfer the fluid from one side to the other side.

"Q. In doing so, then, Mr. Kurosawa had to compute the amount of fluid that could be held in K–4?

"A. I am quite sure that he knew this.

"Q. Do you remember going over and checking his mathematics on that?

"A. No.

"Q. How is it that you know that he did this?

"A. I would say he—because he was interested determining the time, the reaction time, it would take to—for the fluid to pass from one side to the other side.

"Q. Well, did you ask him whether he had computed it and check out the theory of his computation?

"A. No, not on this point.

"Q. Do you know whether anyone did that at all?

"A. I do not know." (Tr. 226–228)

Again:

"Q. Mr. Konvalin, in any event, you did not participate in or help Mr. Kurosawa with his computations, whatever they were?

"A. That is right." (Tr. 235)

Again:

"Q. Did anyone confer with you after the matter left your branch (Kurosawa's modification transferred from Konvalin's branch to that of Mr. Pursell, under direction of Graham) concerning your ideas or thoughts about this matter?

"A. Not to my knowledge." (Tr. 236)

And on cross-examination by the Government:

"Q. Mr. Konvalin, is it customary for a technical consultant to check the computations of a qualified engineer?

"A. In a cursory sort of way." (Tr. 242)

Mr. Graham testified:

"Q. Did you learn about his (Kurosawa's) unsuccessful experiment on a plane at Charleston, South Carolina?

"A. He told me about the test which had been conducted at South Carolina, yes.

"Q. When you first discussed this with Kurosawa did you go into any minute detail as to what he was trying to accomplish?

"A. We went into detail with regards to the actual modification. As far as computations or calculations, I did not go into detail on these.

"Q. You did not study his detailed engineering data on this modification, did you?

"A. No." (Tr. 248)

Pursell, the supervising engineer over Graham, the Group leader, and over Kurosawa, testified:

"Q. Well, wasn't he (Graham) supposed to check on Kurosawa's work to see that, engineeringly speaking, it was properly done?

"A. He would only get involved if Kurosawa got into trouble or when he completed a particular phase of it and was ready to go out with some correspondence or ready to move with another phase. Mr. Kurosawa

was a journeyman engineer and we didn't witness him." (Tr. 156–157)

Furthermore, at no time did either Konvalin, Graham, or Pursell participate in the bench check or fully participate in the ground check. At the time of the ground check (the most crucial test prior to actual flight), Kurosawa was ill. This test was nevertheless made in his absence under the supervision of Snider and Darrell Smith, neither of whom had prior knowledge of the modification, and each of whom had a GS–7 rating, the lowest engineering rating for flight or testing at the Air Force Base.

The short of all this illustrative testimony is that Kurosawa, a GS–11 engineer, was allowed to *forge ahead on his own, without adequate supervision or check on his work, computations and figures.* Since all of Kurosawa's computations and figures were carried with him on the flight and lost in the crash, there is no way left to check on his computations and figures, for no copies thereof were made.[5]

The apparent lack of care evidenced by the foregoing makes it unnecessary to review the testimony of Robert A. Bailey, Chief Engineer, Spacecraft, Lockheed Aircraft Corporation, in Burbank, whose description of the method of measuring ordinary care in the operational phase of making a feasibility study of a proposed modification casts some doubt over the entire procedure adopted by the Air Force engineers at McClellan.

■ Defendant has in no way overcome the inference of negligence engendered by the application of the res ipsa loquitur doctrine. The Court realizes that the res ipsa loquitur doctrine does not *compel* the inference of negligence, but only *permits* it. Nevertheless, the Court is satisfied that the *proper,* as well as the *permissible,* inference is that the inadequate supervision of Kurosawa was the cause of the crash. Furthermore, in light of the great risks involved and the limited experience of Kurosawa, the failure to more closely supervise and check his work was a failure to exercise due care to avoid the foreseeable risks.

## ASSUMPTION OF RISK

■ The Court finds no significant evidence of any conduct of Swanson which in any way contributed to the fatal crash, concludes that the aircraft and the flight were in the exclusive control of defendant and finds no evidence that would warrant a reasonable inference that Swanson had such actual knowledge of the specific danger involved as to constitute an assumption of risk.

■ In determining whether or not Swanson assumed a known risk when he became a passenger on the fatal flight of the C–121, again the Court must apply the California test, which in its application as a defense is more limited than that of most jurisdictions. The Supreme Court of California recently stated in Vierra v. Fifth Avenue Rental Service, (August 1963), 60 A.C. 215, 220, 32 Cal. Rptr. 193, 196, 383 P.2d 777, 780;

> "To warrant the application of the doctrine the evidence must show that the victim appreciated the specific danger involved. He does not assume any risk he does not know or appreciate. (See generally 35 Cal. Jur.2d, Negligence, § 266, pp. 814 et seq.) Stated another way, before the doctrine is applicable, the victim must have not only general knowledge of a danger, but must have knowledge of the particular danger, that is, knowledge of the magnitude of the risk involved."

This is a specific defense, which "now receives only limited acceptance" in aircraft cases, Montellier v. United States, D.C., 202 F.Supp. 384, 397, and which must be affirmatively proved. Defendant has failed to affirmatively prove that Swanson had knowledge of the particular danger and magnitude of the risk involved in the flight of the C–121. True, he was a very knowledgeable field service representative of the aircraft's manufacturer, with twenty-one years ex-

5. Duplicate copies are *now* made.

perience in the aviation industry, had spent five years at McClellan Air Force Base as a field representative of Lockheed [6], participated in the ground test of the modification and worked on the elevator control system of the aircraft. True, also, that he knew that the aircraft was making both a maintenance check and a check of the modification at the time of the flight.

In the exercise of his authorized discretion, Swanson elected to go along on this flight, but there was nothing to indicate to him that this flight was particularly dangerous. In fact, the evidence tended to disclose just the contrary. Bowman testified that Swanson had nothing to do with the installation of the modification (Tr. 460); that he expressed no fear or concern about it (Tr. 484); that Major Davidson was one of the best pilots he had ever flown with (Tr. 454); that Sergeant Nussbaum was a top man in the field as crew chief and flight engineer (Tr. 523); that the plane was in top condition (Tr. 454); that the flight involved was a normal test flight (Tr. 456); that he had made fifteen to twenty similar test flights (Tr. 458); that over a period of twenty-one years he had made over two hundred maintenance test flights (Tr. 458); that the men always took along parachutes on such flights, and that while it was not always the practice to put on chest packs, he considered it good planning (Tr. 463); that there was nothing about the flight that would have kept him from going along, except for an injury to his finger (Tr. 464); that he, Major Davidson, and Swanson were satisfied with the ground check, but that he had not concerned himself with the internal operation (of the modification) (Tr. 509). Swanson's knowledge was pretty much that of Bowman. He had not worked with Kurosawa on the modification (Tr. 112), and when asked about

it by Rinella, his response was "that he either didn't know or was hesitant to tell me" (Tr. 399). Certainly, if the defendant's contention that this was merely a "redundancy" were correct or believed to be correct, there was no occasion to assume any particular danger or risk in the flight. Furthermore, if neither Pursell nor Graham nor Konvalin had particular detailed knowledge of the modification, there is no basis for assuming that Swanson had such knowledge. In fact, there is no evidence to show that Swanson was aware of the failure of defendant to properly supervise and check Kurosawa's work. The natural assumption for Swanson would be that there was proper supervision. Although Swanson was aware of the normal flight test risk, it cannot be said that Swanson had knowledge of the magnitude of the specific risk created by the defendant's failure to properly supervise Kurosawa. Applying the test of the Vierra case, the Court finds that there was no assumption of the specific risk on the part of Swanson.

## AMOUNT OF DAMAGES

■ The amount of damages to be awarded by the Court in a wrongful death case in California is governed by Section 377 of the California Code of Civil Procedure, which provides that "such damages may be given as under all the circumstances of the case, may be just." With this statutory provision in mind, the Court awards damages in the sum of $125,592.00 to the widow and in the sum of $15,000.00 to each of the decedent's minor sons, making the total award to plaintiffs the sum of $155,592.-00.

These amounts were reached in the following manner:

The deceased was earning approximately $12,500.00 per year, and his net

6. The letter of authorization from Swanson to the Commander of the McClellan Air Force Base dated August 15, 1958, read in part:

"In performance of the duties of a Field Representative the LAC personnel assigned to your organzation occasionally find it necessary to observe certain aircraft troubles experienced during flight. This function is sanctioned by our Company policy and in turn the necessity for the same is left up to the discretion of each individual representative."

income after taxes was approximately $10,500.00 per year. This was his approximate net income range during the five years immediately preceding his death, and there is no evidence to rebut the natural inference that Swanson, after twenty-one years with Lockheed, had reached his peak earning capacity. This Court should not and will not speculate as to his possible increased earning power. As the Court said in Rogow v. United States, supra, at 561 of 173 F.Supp.:

"His income had levelled off in the years preceding his death and I am offered no evidence upon which to approximate a reasonable estimate of increases to earnings."

The Court does not accept Mrs. Swanson's estimate of only $100.00 per month as the sum retained by decedent for his personal needs. It seems unbelieveable to the Court that a man of Swanson's income and position, having the expensive hobbies he had, taking vacations, dressing as he did and maintaining the standard of living he would be expected to and did maintain, retained only $100.00 per month for himself and contributed the remainder of approximately $800.00 per month for the exclusive use of his family. The Court is warranted in finding and finds that one-quarter of the decedent's net annual income (about $2,400.00 per year) should be attributed to his personal needs until 1976, when his first son would reach maturity, that one-third of his net annual income ($3,500.00 per year) should be attributed to his personal needs from 1976 until 1980, when his second son would reach maturity, and that about one-half thereof ($5,250.00 per year) should be attributed to his personal needs from 1980 until 1984, when the decedent would have reached the age of sixty-five years had he not been killed. Based upon the foregoing, the damages to the widow are fixed and awarded in accordance with the following schedule:

1. Damages from date of death to date of judgment (4/22/61 to 12/31/63—a period of of 2 years and 8 months) at the rate of $8,100.00 per year ($10,500.00 less $2,400.00) ... $ 21,600.00

2. Interest on $21,600.00 at 4% per annum, based upon increased accumulations from date of death until 12/31/63 ... 1,629.00

3. Future damages:
   1964 until 1976 (12 x $8,100.00) ... $ 97,200.00
   1976 until 1980
      (4 x $7,000.00) ... 28,000.00
   1980 until 1984
      (4 x $5,250.00) ... 21,000.00

   Total future damages
      before discount ... $146,200.00
   Less 4% discount on
      $146,200.00 over a period
      of 20 years fixes present
      value at ... 101,153.00

4. Funeral and burial expenses ... 1,210.00

   Total award to widow ... $125,592.00

The Court deems a reasonable award to each of the sons for the loss of parental guidance and training to be $15,000.00. No particular ability to create an appreciable estate was proven, and the Court knows of no justification for an estate allowance in this case. Thus, the Court finds that the total damages sustained by plaintiffs, the beneficiaries of Franklin R. Swanson, Sr., deceased, to be $155,592.00. Should there be any dispute as to the Court's computations, the Court further finds, without regard to the computations made, that "under all the circumstances of the case", the sum of $125,592.00 for the widow of the decedent, and the sum of $15,000.00 for each of the two sons of the decedent, constitute just damages for the wrongful death of the decedent.

The foregoing will constitute the findings of fact and conclusions of law of the Court under Rule 52, Federal Rules of Civil Procedure, 28 U.S.C. Judgment shall be entered in favor of plaintiffs accordingly.

Dated: December 31, 1963.