Mattie Lee SIMPSON and Howard Simpson, Plaintiffs,

v.

KNUT KNUTSEN, O. A. S., Defendant.

No. 46605.

United States District Court
N. D. California.

Feb. 22, 1969.

Dorsey Redland, San Francisco, Cal., for plaintiffs.

E. Judge Elderkin and Raoul D. Kennedy, of Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant.

## OPINION

HODGE, District Judge.

This is an action for wrongful death brought pursuant to the provisions of the California Wrongful Death Act, C.C.P. § 377, and the General Maritime Law of the United States. The action involves the accidental death of Lawrence Simpson, a longshore boss, on board the steamship S.S. Ellen Bakke, owned by the defendant corporation, while moored at the Encinal Terminal in San Francisco Bay. Plaintiff Mattie Lee Simpson is the widow of the decedent Lawrence Simpson, and plaintiff Howard Simpson is the son of the decedent. Plaintiffs originally alleged a cause of action for unseaworthiness of the vessel and a second cause of action for negligence of the officers of the ship; but the cause of action for negligence was waived and the case tried upon the theory of unseaworthiness of the vessel. Plaintiffs had demanded a jury trial, also alleging diversity of citizenship, but such jury was waived by both parties at the commencement of the trial and the case tried to the Court without a jury.

The stipulated facts are as follows: Lawrence Simpson was employed as a gang boss by Matson Terminals, Inc., and was working aboard the steamship S.S. Ellen Bakke on the evening of February 22, 1967, in the #3 hatch of the vessel. During the course of his employment he stepped aboard a lift truck which is also designated in the evidence as a "jitney" and drove it out over a portion of the hatch. The hatch boards collapsed and the lift truck fell to the bottom of the hold on top of the decedent who died shortly thereafter. The lift truck was landed on the portion of the hatch where there was a queen beam and a king beam in place. The hatch boards collapsed in that portion of the hatch where the blind or queen beam had been left out. The queen beams in that portion of the hatch through the entire four decks had been left out in closing the hatch.

Other facts not contested may be summarized briefly as follows: On the way from San Pedro Harbor to San Francisco Bay the #3 hatch had been ordered cleaned by the Master of the vessel, which necessitated taking out the queen beams in the forward portion of the hatch in order to remove gratings. This work had not been completed and the hatch boards had been replaced without replacing the queen beams. The loading was to be done from the 'tween deck of the hatch which is the next deck below the "weather" or main deck. Originally it was not intended to use the #3 hatch at the terminal, but further cargo space was requested by the longshoremen and the #3 hatch was designated by the ship's First Officer. As gang boss Simpson was in direct charge of the longshore gang; his immediate supervisor was one Banchero, who was known as the "walking boss". Banchero was in the hold when the gang first assembled there and ordered that the "jitney" or lift truck be brought aboard but left shortly thereafter. Simpson was the operator of the lift truck.

The #3 hatch is divided into two sections known as the forward and aft sections. In each section there is a steel beam known as the king beam, and in the forward and aft portions of the section there is a further steel beam known as the queen beam, which supports the hatch covers. The king beam is visible with the hatch covers on, but the queen beam is not. Heavy steel plates were available to place on top of the hatch covers, but were not used.

There was a conflict in the evidence as to the use of these plates. A witness for the plaintiffs who was one of the longshore gang testified that Banchero had stated that the use of the plates was not necessary; but Mr. Banchero, called as a witness, testified that he had instructed Simpson to use plates.

## LIABILITY

The Court heard argument and rendered decision on the issue of liability only and reserved decision on the matter of damages. For the purpose of findings of fact and conclusions of law I will incorporate here the findings of the Court regarding liability.

■ The Court finds from a preponderance of the evidence that at the time of this accident the S.S. Ellen Bakke was unseaworthy by reason of the failure of the ship to provide the longshoremen, whose duty it is to load the cargo, with a safe place to do such designated work, in that:

(a) the supporting queen beam or beams were left out of the forward portion of the after section of the #3 hatch, rendering it unsafe or at least increasing the danger or hazard to the operator of the lift;

(b) the use of the #3 hatch had been expressly authorized by the Chief Officer of the ship;

(c) the regulations applicable require that the ships provide a safe loading place for the longshoremen;

(d) there was no warning given to the longshore gang by any officer of the ship that the queen beam was missing; and

(e) the use of the heavy forklift is often used in loading operations and should have been anticipated by the ship's officers.

I also find that such unseaworthiness was a proximate cause of the accident.

■ The Court also finds by a preponderance of the evidence that there was comparative negligence on the part of the decedent which was certainly a contributing cause, by reason of:

(a) the failure of Simpson to use ordinary care in the use of the forklift when the queen beam was shown by the evidence to be in full view of the hatch on the deck of the vessel, which should have put him on notice, especially in that this type of queen beam was used only in a refrigerated hatch such as the #3 hatch;

(b) Simpson's advancing the forklift over the highly dangerous area of the hatch without the use of the steel plates, which would serve at least to distribute the weight of the heavy forklift; and

(c) safety regulations for longshoring provide that cargo shall not be handled over a covered hatch unless all beams are in place under the hatch covers, and that adequate provisions shall be made to ensure that the working surface can support any vehicle used.

In this connection I find that it was not the duty of Simpson to look under the hatch covers to see if the queen beam was in place, but that an ordinarily prudent person would have done so under these circumstances.

It is difficult to measure the comparative negligence with any mathematical accuracy; but the Court finds that the fault should be borne equally between the plaintiffs and the defendant ship owner, that is on a 50/50 basis.

## DAMAGES

We turn then to the matter of damages, which was submitted by the parties upon briefs and numerous exhibits filed. I shall consider first the evidence of damages as to the plaintiff Mattie Lee Simpson.

■ There are three general elements of damages to be considered:

(1) Contribution, or the loss of Mrs. Simpson's share of Lawrence Simpson's income or financial support and sustenance of her husband;

(2) Funeral and burial expenses;

(3) Other expenses such as household services or the monetary value of such which Lawrence Simpson performed during his lifetime and for which Mrs. Simpson is now obliged to pay.

[4] A considerable portion of plaintiff's claim for damages is based upon the theory of loss of consortium or loss of the care, comfort, affection, companionship, society and counsel of the decedent. The Court sustained an objection to this line of testimony for the reason that although this case was filed as a law action, it is actually an action in admiralty in the nature of a libel in personam for wrongful death, and admiralty law must apply as to the measure of damages; and, further, that loss of consortium is not an element of damages under the admiralty law. I adhere to that decision.

Plaintiffs urgently contend that the Wrongful Death Act of California must apply and that under the California statute damages have been awarded for loss of consortium, although there are cases to the contrary. Deshotel v. Atchison, Topeka & Santa Fe Ry. Co., 50 Cal.2d 664, 328 P.2d 449 (1958); Swanson v. United States, (D.C.Cal.) 229 F.Supp. 217, decided by this Court in 1964. In the *Deshotel* case the Court expressly holds that a wife may not recover for the loss of consortium of her husband where he has sustained injury resulting from negligence. The same situation should apply to wrongful death. In the *Swanson* case no consideration was given whatever to the question of loss of consortium. The damages awarded were based wholly upon pecuniary loss.

The California Wrongful Death Act simply provides that,

" * * * In every action under this section, such damages may be given as under all the circumstances of the case, may be just * * *. The respective rights of the heirs in any award shall be determined by the court. * * * "

There is, of course, no remedy in admiralty for damages for wrongful death of a seaman or longshoreman caused by unseaworthiness of the vessel, but the courts have held that where a local statute grants rights for damages for wrongful death the federal courts may entertain a cause of action for wrongful death.

■ However, it is also held that although a state may by its wrongful death statute preserve a cause of action for death resulting from a maritime tort, no such local law may change the general features of the admiralty law so as to defeat its uniformity; and that although under local statute there is a right to recover for wrongful death in an admiralty court for tort committed on navigable waters of the United States, a claim for damages must be governed by the maritime law. Western Fuel Co. v. Garcia, 257 U.S. 233, 42 S.Ct. 89, 66 L. Ed. 210 (1921); Curry v. Fred Olsen Line, (C.A.9, 1966) 367 F.2d 921; Igneri v. Cie de Transports Oceaniques, (C.A.2, 1963) 323 F.2d 257; Nollenberger v. United Air Lines, Inc., 216 F.Supp. 734 (1963), affirmed United Air Lines, Inc. v. Wiener, 9 Cir., 335 F.2d 379; 1 Am.Jur., Admiralty, §§ 51, 52. The *Garcia* case is followed by Judge Sweigert of this court in the case of Allen v. United States, D.C., 235 F.Supp. 950 (1963).

*Support*: Decedent was approximately forty-five and one-half years of age at the time of his death and had been a longshoreman for some twenty years. His work life expectancy as shown by tables of the United States Public Health Service (Exh. 31 & 33) was 19.25 years. His life expectancy as shown by tables of the United States Department of Health, Education & Welfare (Exh. 32) was twenty-four years.

The decedent's average earnings for the five years preceding his death as

shown by the records of the Pacific Maritime Association (Exh. 16 & 34) were $10,841.00. However, he had been recently promoted to gang boss with increased wages reflected in his earnings for 1966 of $12,935.00 and up to February 20, 1967 of $2,831.00. Such wages were largely overtime (Exh. 35) as he worked from 6:00 p. m. to 4:00 a. m. He had undoubtedly reached the peak of his earning power, but it seems reasonable to expect a continuance of his wages at the time of his death or approximately $13,000.00; and it seems fair to fix this amount as his estimated earnings. I would figure no increase beyond the end of his contract (Exh. 41) although wages have shown a steady increase (Exh. 40), as purely speculative.

█ From this amount defendant would deduct an estimated amount of income tax and apparently other taxes withheld from decedent's wages. However, the federal courts have held that where applicable state law is silent on the question of whether gross or net income is to be used by the trial judge in computing damages, the courts should use gross income as the proper measure, as there is no legal authority for deducting income tax at an estimated liability in determining the present value of future earnings. O'Donnell v. Great Northern Ry. Co., (D.C.Cal.1951) 109 F.Supp. 590; Cunningham v. Rederiet Vindeggen A/S, (C.A.2, 1964) 333 F.2d 308; McWeeney v. New York, New Haven & Hartford Ry. Co., (C.A.2, 1960) 282 F.2d 34, certiorari denied 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93; Stokes v. United States, (C.A.2, 1944) 144 F.2d 82; Runnels v. City of Douglas, (D.C.1954) 124 F.Supp. 657, 15 Alaska 221. The reason for such rule appears to be that such taxes are speculative.

This principle might not apply to his earnings during the past two years except that we have no evidence of what his net earnings or his net taxable income would be. No income tax records were produced. This item, therefore, is also speculative.

█ In accordance with the usual contribution theory applied to damages in the federal courts as well as the California courts, the survivors are only entitled to that portion of the decedent's income which they would have received had he lived. This amount is usually figured at 50% of the husband's income. Swanson v. United States, supra. In this connection I must reject the estimate given by an expert consultant or economist called as a witness on behalf of plaintiffs that Mr. Simpson's personal expenditures averaged only about 30%, as being without foundation and not realistic.[1] This standard applies where, as here the decedent's household consisted only of his wife and no minor children. This item should then be allowed at $6,500.00 per year for support during the period accrued from the date of death to the entry of judgment (estimating such entry of judgment as approximately two years from the date of death).

*Expenses*: Funeral and burial expenses are claimed at $2,863.80 (Exh. 22) which are not contested by defendant and may be allowed.

The evidence disclosed that since decedent's death Mrs. Simpson has been required to pay health benefits which her husband had formerly paid amounting at date of entry of judgment to $262.40 (Exh. 23) which may be allowed.

Decedent also did considerable gardening work during his off hours which the evidence disclosed Mrs. Simpson has since been unable to do and has been required to hire a gardener at a cost of $25.00, now raised to $35.00, per month. This item should be allowed to date at $740.00 (Exh. 24).

1. The evidence disclosed that Mr. Simpson's standard of living and expenses were at least normal considering his income. He had six dress suits and four pairs of dress shoes in addition to working clothes and maintained a nice, though modest, home.

The evidence also disclosed that Mrs. Simpson had been obliged to hire help for household work which Mr. Simpson had previously done during his off hours at an expense to date of $1,530.00 (Exh. 25) which also may be allowed.

Further expense was shown for home upkeep and maintenance since Mr. Simpson's death, including painting of the exterior and interior of the home and also including installation of a security alarm service and monthly security charge amounting to date to $902.00 (Exh. 26) which also may be allowed.

This makes a total of expenses to date of $6,298.20 and a total of accrued losses of $19,298.20 to which should be added interest at 6% per annum. This figure, of course, must be reduced by 50% on account of comparative negligence as will be shown on the table below.

*Future Losses*: Future support should be figured at an average of $6,500.00 per year for 17.25 years amounting to $112,125.00. This must be reduced to the present worth in accordance with the usual tables (Exh. I) with interest at 6%[2] using a factor of 10.65, amounting to $69,225.00.

*Future Expense*: Health care costs may be allowed at a continuing amount of approximately $130.00 per year for twenty-two years of remaining life expectancy or $2,860.00.

Gardening expense may also be allowed at $35.00 per month or $420.00 per year for a period of twenty-two years amounting to $9,240.00.

Continuation of allowance for household expenses should no longer be necessary for the reason that when Mrs. Simpson is compensated for the loss of her husband she will have overcome the financial hurdle which has caused her to work and be able to retire, and there will no longer be the necessity for her to employ household help. In fact, Mrs. Simpson testified that she expected to quit work in August.

Some further home maintenance and upkeep may be required consisting largely of painting (Exh. 26) in the sum of $455.00 which may be added to expense to be incurred.

These items for future expense totaling $12,100.00 (excepting the item of $455.00) must be reduced to present worth in accordance with the usual tables (Exh. I) covering a period of twenty-two years at 6% with a factor of 12.04.

*Other Benefits*: Mrs. Simpson could theoretically have collected the sum of $8,000.00 from the longshoremen's mechanization fund ($13,000.00 less $5,000.00 death benefits paid), provided Mr. Simpson, had he lived, would have been able to retire at age sixty-five and be otherwise qualified for such benefits. This item appears too speculative to be allowed.

There is also an item claimed of anticipated pension. Again theoretically, Mr. Simpson would have been entitled to a pension of $235.00 per month had he lived and had he retired at age sixty-five, of which one-half could be collected by the widow during the remainder of her life time after his death, provided that Mrs. Simpson survived him. This item also appears too speculative to be allowed as damages.

This makes a total of future losses of $76,302.00 after allowance for present worth or value.

■ The total amount of damages must be reduced then by 50% to allow for comparative negligence of the decedent, leaving an amount to be allowed to plaintiff Mattie Lee Simpson of $48,957.99.

### HOWARD SIMPSON

■ Recovery is also sought in this action by the decedent's son Howard, based largely upon loss of consortium but also including some minor support which Howard testified he had received

---

2. This figure appears high, but witnesses, for both plaintiffs and defendant testified to such figure which appears to be agreeable to both parties.

from his father largely when he had been injured and was incapacitated. Howard was twenty-seven years old at the time of his father's death and was then married and living away from home and, according to his own testimony, was earning from $600.00 to $800.00 per month. Since the measure of damages is limited to pecuniary loss, these claims appear to be without merit and are disallowed.

## CONCLUSION

The total damages awarded to Mrs. Simpson may then be computed in accordance with the following table:

Accrued Damages:

| | | |
|---|---|---|
| Loss of support, earnings—2 years at $13,000 per year ($26,000) less one-half husband's share | | $13,000.00 |
| Expenses: | | |
| Funeral & burial expense | $2,863.80 | |
| Health care costs | 262.40 | |
| Gardening expense | 740.00 | |
| Heavy household expense | 1,530.00 | |
| Home upkeep & maintenance | 902.00 | 6,298.20 |
| Total Losses | | $19,298.20 |
| Plus interest thereon at 6% per annum | | 2,315.78 |
| Total Accrued Damages without deduction for comparative negligence | | $21,613.98 |

Future Damages:

| | | |
|---|---|---|
| Loss of support—$6,500 per year for 17.25 years ($112,125) reduced to present worth at 6% (factor 10.65) | | $69,225.00 |
| Annual Expenses: | | |
| Health care costs—22 years at $130 per year | $ 2,860.00 | |
| Gardening expense—22 years at $420 per year | 9,240.00 | |
| | $12,100.00 | |
| Reduced to present worth at 6% (factor 12.04) | | 6,622.00 |
| Plus initial expense for home upkeep and maintenance | | 455.00 |
| Total Future Damages | | $76,302.00 |
| Grand Total – All damages | | $97,915.98 |
| Less one-half for comparative negligence–AWARD | | 48,957.99 |

The foregoing will constitute the findings of that and conclusions of law of the Court under Rule 52, Federal Rules of Civil Procedure. Judgment may be prepared and presented accordingly in favor of plaintiff Mattie Lee Simpson. If there be any errors of computation such may be called to the attention of the Court and corrected in the final judgment offered.

Each party shall bear his own costs. No attorneys fees are allowed.