**Dennis G. MARTIN, Administrator of the Estate of Harry Eugene Walker, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 75–2918.

United States Court of Appeals, Ninth Circuit.

Dec. 3, 1976.

Rehearing Denied Jan. 14, 1977.

---

Robert Glancz, Atty. (argued), of U. S. Dept. of Justice, Los Angeles, Cal., for defendant-appellant.

Stephen I. Zetterberg (argued), of Zetterberg & Zetterberg, Claremont, Cal., for plaintiff-appellee.

Before BARNES and ELY, Circuit Judges, and VAN PELT, Senior District Judge.*

VAN PELT, Senior District Judge:

This is a Federal Tort Claims Act case. It arises by reason of the death of Harry Eugene Walker, age 25, who was unmar-

* Honorable Robert Van Pelt, Senior United States District Judge, District of Nebraska, sitting by designation.

ried, on June 25, 1972 in Yellowstone National Park following an attack by a grizzly bear. The trial judge, Judge A. Andrew Hauk, awarded damages of $87,417.67 allocated to decedent's father, mother and sister, plus costs. Defendant, United States of America, has appealed.

While the appellant and appellee do not agree as to the statement of the issues, it is believed that a fair statement of the questions presented by the appeal is:

1) Whether the Tort Claims Act exemption contained in 28 U.S.C. § 2680(a) bars a recovery in this case.

2) Whether the United States is liable under the facts of this case for the death of a hitchhiker attacked by a grizzly bear in Yellowstone National Park.

3) Whether the United States was guilty of willfully failing to warn the decedent of a dangerous condition under the facts of this case (The trial court, in effect, so found in finding No. 7).

4) The standard of care owed by the United States of America to decedent, a hitchhiker, who paid no admission when he entered the park and was camping without permission in an unauthorized area.

5) Whether decedent was contributorily negligent, and if so, whether such negligence bars a recovery.

6) Whether omissions or negligence of the Park Service was the proximate cause of Walker's death.

7) Whether it is sufficient to prove that it was within the realm of possibility that bear Number 1792, which was sought after Walker's death, and killed, was the same bear that had disturbed a camp on Fire Hole River, where a man disappeared in September, 1970, or is the standard one of reasonable probability.

We conclude that our decision on the first issue makes unnecessary deciding the others although comment on some other questions is necessary in a full discussion of the facts.

Originally an issue was made of whether the California state court could appoint an administrator for the estate of an Alabama resident whose only asset was the wrongful death claim. It is not pressed in this court. Interestingly, all of the Yellowstone National Park bear cases have been brought in states other than Wyoming.

The record discloses that decedent Walker and a friend, Phillip Bradberry, who escaped the grizzly bear's attack and summoned aid for Walker, were hitchhiking into Yellowstone National Park on Thursday, June 22, 1972. Vikki Searer, a maid at Old Faithful Inn, was driving to her work in the park and gave them a ride. They arrived at the North park entrance about 5:00 p. m. Searer's car had a sticker on it which identified her as a park employee. She and the two hitchhikers were waived through the gate by the attendant. Thus the two hitchhikers paid no entrance fee and did not receive the brochures distributed to all park visitors, which included a map of the park, a red folder entitled "Danger", and a pamphlet about bears. At the entrance to the park there is a large sign approximately 7 feet by 5 feet with a map on it, showing the designated campground areas and stating: "Overnight stopping permitted only in designated campgrounds." Searer testified that Walker and Bradberry asked her whether they needed a permit to camp and were told that they did and to obtain it at the Ranger Station. They said they did not want to go to the Ranger Station. When they asked her to recommend a good place to camp she again told them to go to the Ranger Station and get a camping permit. This they did not do. Had they gone to the Ranger Station or to the Visitors' Center they would have received pamphlets entitled "In Grizzly Country", a list of designated campgrounds, and a pamphlet entitled "Campground Management." The Rangers would also have evaluated their camping abilities and if entitled could have issued a back country permit and assigned them to a particular site regularly patrolled by the park Rangers.

The men left the Searer car near the girls' dorm for Old Faithful Inn and went to the upper geyser basin and the Old

Faithful Geyser area. Here they walked on boardwalks which were posted with signs which advised staying on the boardwalks due to the thermal features. Nevertheless, the two left the boardwalks, walked into the forest, climbed a hill and pitched camp a considerable distance from the boardwalk. Decedent that evening called on Searer at the dorm and then returned to the campsite. The next evening both young men went to the dorm and Searer returned with them to their campsite. She told them they were too close to the geysers and would "catch hell" if caught at an unauthorized campsite. They told her of seeing paw prints, although they may have been joking. She told them she was scared and decedent and Searer returned to the dorm. She saw both hitchhikers the next day, after which the two men returned to the campsite and cooked dinner. They left a pot of food tied in a tree and returned to the dorm area in the evening. As they returned to their campsite around midnight, Walker was attacked by a bear and killed. A sow grizzly, No. 1792, was trapped the next day at the Walker-Bradberry campsite, and killed.

The bear handling policies of Yellowstone Park, both in general and with respect to sow grizzly 1792, were the subject of testimony at the trial. The evidence showed that there had been a meeting at Yellowstone on September 6 and 7, 1970, to consider the management of grizzly bears. Present at this meeting were three members of the National Sciences Advisory Committee, the director of the National Park Service and some of his staff, Jack K. Anderson, Superintendent of Yellowstone, and some of his staff, as well as three consultants on grizzlies, Dr. John Craighead, Dr. Frank C. Craighead, and Dr. Charles E. Olmsted. Jack K. Anderson testified that everyone at the meeting was in agreement that the garbage dumps at the Park had to be closed to prevent the bears from feeding there. However, there was no consensus as to how this should be done. Essentially, there were two choices—the dumps could be phased out gradually or closed abruptly. Drs. Frank and John Craighead had studied the bears in Yellowstone for several years and maintained a laboratory there which was closed in 1970. They had prepared a 113 page report in 1967 for the National Park Service entitled "Management of Bears in Yellowstone National Park" recommending that any closure of garbage dumps be done slowly or the garbage be replaced with another food source, such as placing carrion out for the bears to eat. It was Dr. Frank Craighead's opinion, both in the report and at trial, that closing the dumps abruptly would cause a change in the movement and habits of the grizzly bears, and that they would tend to go into the campgrounds in search of food. At the September, 1970 meeting a report was presented (referred to as "the Leopold Report") by Dr. A. Starker Leopold, who was Chairman of the National Sciences Advisory Committee from its inception until April, 1972. This report stated that whether the closure of the dumps should be abrupt or gradual depended upon judgment, as there was no data on the subject. The Leopold report did not adopt one theory over the other. Mr. Glen Cole, Chief Research Biologist at Yellowstone, had compiled park records on grizzly injuries to humans and past management of bears in the park and presented this information at the September meeting. The Park Service drew up an eleven point bear management program based upon the Leopold and Cole reports. The main thrust of this program was to cease feeding garbage to grizzly bears while maintaining the public safety. All members of the National Sciences Advisory Committee supported the abrupt closure decision, and the garbage dumps were closed down in 1970 and 1971. Superintendent Anderson testified that the decision to close the dumps abruptly was made because it was felt that the longer the bears had the garbage to feed upon the more they would rely on it, and new generations of cubs would become accustomed to human food. He also testified that a decision was made not to use supplemental carrion feeding because:

I felt that we would be instituting another dangerous procedure by placing elk out, where people might wander into a

grizzly on an elk unknowingly. Our putting the elk out there, because the implication was that they thought they should be close to campgrounds. And youngsters have a way of walking out of the campground into the wood . . . .
T. Vol. X, p. 1079, 1. 18–23. Superintendent Anderson testified that precautions taken when the dumps were closed included sanitizing the campgrounds, expanding the information programs, extra night patrol Rangers, a six man Ranger team to move bears which appeared close to campgrounds and human areas, and the closure of some campgrounds.

The Government's evidence showed that in 1971, the year when the last park dump was closed, there were no injuries from bears for the first time in 15 years and no injuries again in 1973 and 1974. There were injuries in 1972, including Walker's death. The only two prior fatalities from grizzlies had been in 1907 and 1916. The Government's testimony was to the effect that the bears encountered in camping areas has dropped each year since 1971.

Dr. Frank Craighead, who was called as a witness for plaintiff, testified that the Government was negligent in creating an unreasonable danger by abruptly closing the garbage dumps and failing to warn decedent and others of the dangers, and that the precautions undertaken were carelessly and faultily planned and negligently effected. With respect to bear No. 1792, Dr. Craighead testified that the Park Service was negligent and did not act with reasonable prudence when on October 14, 1970 it transported a grizzly bear, No. 1792, to Gibbon Meadows, which is 18 miles north of the Old Faithful area. It was Dr. Craighead's opinion that when a bear is transplanted no more than 50 miles away from where it is captured, the bear will soon return to the point of capture. He also testified it was likely that No. 1792 had invaded a camp on September 16, 1970; that it was within the realm of possibility that the bear that destroyed and invaded that camp, which in the record is frequently called the Fire Hole Camp or the Fire Hole River incident, was the same bear seen in the Old Faithful area the week prior to that incident and the same bear which was trapped and then transplanted to Gibbon Meadows. However, Dr. Leopold testified that he considered this a successful move, since bear No. 1792 did not show up for two years after the transplant and there was no evidence that No. 1792 was the bear responsible for the Fire Hole incident. Dr. Leopold testified that he also thought 18 miles was sufficient since the bear was moved well into the fall and at this time of year the campgrounds are not occupied and the bears are seeking a place to hibernate. Mr. Cole testified that there was no indication that Gibbon Meadows was not a good release site. He stated that some bears released 50 miles away return to the site of their capture and others that are released only 18 miles away do not return to the site of their capture. Dr. Arthur Pearson, a research scientist with Canadian Wildlife Service, testified that often trapping a grizzly bear has a negative impact on the bear, and it will not return to the site at which it was trapped. Dr. Pearson also testified that "each translocation must be judged on its own merits as to whether it is successful" (T. Vol. XIV, p. 1508, 1. 19–20) and that based on the knowledge that was available he thought it was reasonable to transplant the bear to Gibbon Meadows, and that the transplant was successful. It was his opinion that the bear was in her normal grizzly habitat at the time of the accident.

The foregoing is only a brief resume of the transcript which comprises 1745 pages, and relates particularly to the exercise by the Government employees of their discretionary functions and duties with respect to bear management.

The parties agree that this court is bound by Judge Hauk's findings of fact unless we find them to be clearly erroneous. In determining whether findings of fact are or are not clearly erroneous, we look to the teaching of *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), where it is stated:

A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

This panel is firmly convinced that a mistake has been committed by the trial judge in certain of his findings and in entering judgment for the plaintiff. We are likewise firmly convinced that the case should be reversed and dismissed.

■ The Federal Tort Claims Act, 28 U.S.C. § 2680(a) provides:

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

We are convinced that the acts of the Park Service or Interior Department employees which Dr. Craighead said constituted negligence are within the protection of 28 U.S.C. § 2680(a) and the discretionary function rule enunciated in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). That case held that various decisions with respect to instituting a fertilizer export program, conducting further experiments regarding the combustibility of the fertilizer, and decisions regarding bagging temperature, bag labelling, fertilizer coating and bagging material were all made at a planning rather than operational level. The case specifically states that "all employees exercising discretion" are covered by the Act. *Id.* at 33, 73 S.Ct. 956. The summary of the record shows that the decision to abruptly close the garbage dumps was likewise made at the planning level. Superintendent Anderson, who issued the

regulations and who made the decisions of which plaintiff and Dr. Craighead complain, was making a policy judgment. Even Dr. Craighead agreed at the trial that the handling of bears is a matter of judgment and someone must apply it. Similarly, we believe that the measures taken to prevent human-bear contact at this time were discretionary, as was the decision to transplant bear No. 1792 to Gibbon Meadows, 18 miles north of the Old Faithful area.

■ We do not believe it was the intention of Congress in enacting 28 U.S.C. § 2680(a) to fasten liability upon the defendant for its handling of bears generally or sow 1792 in particular when such discretion is exercised reasonably, after investigation, consultation, and reports by qualified experts in the field. It was not the intention of the Congress as we read the Federal Tort Claims Act and the enactments relating to Yellowstone Park, to make the defendant, United States of America, an insurer of the safety of all Yellowstone National Park visitors. Approval of the trial judge's findings and order would, in effect, do that. We should also note that our conclusions here find support in *Rubenstein v. United States*, 338 F.Supp. 654 (N.D.Cal. 1972), a decision by Judge Spencer Williams which was affirmed by a panel of this court in 9 Cir., 488 F.2d 1071.

We would further comment that it is clear that these two young men disregarded the advice and the warnings of Miss Searer and intentionally failed to go to the Ranger Station or the Visitors' Center. Thus they avoided receiving warnings about bears, both grizzly and black. It is clear that they camped in an area which they knew was unauthorized. All of the warnings which the Park Service could devise will do no good as to persons such as decedent and Bradberry who, in effect, refuse to put themselves in contact with persons from whom they would receive advice, including warnings, and by whom they would be told not to camp at a place they seemed determined to camp.

■ We again note that the two young men disregarded the warnings they did re-

ceive. To require the Park Service to post signs and warnings on every boardwalk, path or trail every few hundred feet throughout a park as extensive as Yellowstone would not only be prohibitive in cost but would destroy the park's beauty as well. To require the Park Service to search out from among the 25,000 daily visitors on the days decedent and Bradberry were in the park those two and any others who had entered the park without paying and without receiving the warning bulletins and to hold that failure to warn such individuals is actionable negligence is for the Congress and not for the courts. To date, as we read the Federal Tort Claims Act and the acts relating to Yellowstone in particular, and other national parks generally, the Congress has not intended such broad coverage. Fortunately there are but few who, like decedent and Bradberry, come in without paying the required fee and attempt to avoid receiving the services and advice, including warnings, which the Park Service provides. We find there is no credible evidence to support the trial judge's findings that the Park Service willfully failed to warn decedent of a dangerous condition. Instead, the trial court could well have found that the decedent willfully disregarded the warnings he was given.

We would also note that in 1973 the Wyoming legislature passed a comparative negligence law which has been determined not to be retroactive. Therefore, the previous contributory negligence rule of Wyoming, which would bar recovery by decedent if there was any negligence on his part, is applicable in this case. The above recited facts show such contributory negligence and do not need to be repeated here.

This case is reversed and remanded with directions to the trial court to enter an order dismissing the complaint at the costs of the plaintiff.