Harold C. MEDLEY, Gary Canova, Toni Breese and Suzanne Edwards, Plaintiffs,

v.

UNITED STATES of America, Defendant.

CENTRAL NATIONAL INSURANCE COMPANY OF OMAHA, NEBRASKA, Plaintiffs,

v.

UNITED STATES of America, Defendant.

AETNA CASUALTY & SURETY COMPANY, Plaintiff,

v.

UNITED STATES of America [Federal Aviation Administration (Department of Transportation), National Oceanic and Atmospheric Administration (Department of Commerce) ], Defendants.

Nos. C–79–2832 RPA, C–80–3777 RPA and C–79–1842 RPA.

United States District Court, N. D. California.

June 30, 1982.

Jack T. Friedman, Carroll, Burdick, McDonough, Thomas J. Brandi, Abramson & Bianco, San Francisco, Cal., for plaintiffs.

Mary L. Grad, J. Paul McGrath, U. S. Dept. of Justice, Washington, D. C., for defendant.

## OPINION AND ORDER

AGUILAR, District Judge.

These three consolidated actions arise out of two separate aircraft crashes in the Sierra Nevada mountain range. In April of 1978, Harold C. Medley was piloting his Beechcraft Sundowner C–23 aircraft, with his wife as passenger, from San Jose, California, to an intended destination in Death Valley, California. As the plane was crossing the Sierras, "rapidly rising terrain which was beyond the performance level of the aircraft," (Memorandum in Support of Defendant's Motion for Summary Judgment, p. 1), was suddenly encountered and the plane crashed. Medley had flown into, and become trapped in, a "blind canyon" known as Center Basin, located north of the Kearsarge Pass in the King's Canyon area of the Sierras. As a result of the crash Mrs. Medley was killed, Medley was injured, and the aircraft was destroyed. *Medley v. United States of America*, C–79–2832 RPA, is brought by Medley, who sues for the wrongful death of his wife, for the personal injuries he sustained in the crash, and for the property damage to his aircraft. *Central National Insurance Company of Omaha, Nebraska v. United States of America*, C–80–3777 RPA, is an indemnity action brought by Medley's insurer to recover sums paid out pursuant to an insurance policy providing passenger bodily injury coverage.

In February of 1979, Dale C. Harwood was piloting a Piper Archer aircraft owned by Donald J. and Donna L. Smith in the King's Canyon area of the Sierras. The plane crashed when Harwood suddenly encountered "rapidly rising terrain which was beyond the performance level of the aircraft," (Memorandum in Support of Defendant's Motion for Summary Judgment,

p. 2), after entering, and becoming trapped in, the Center Basin "blind canyon." *Aetna Casualty & Surety Company v. United States of America*, C–79–1842 RPA, is an indemnity action brought by the Smith's insurer to recover sums paid out pursuant to an insurance policy for property damage to the aircraft.[1]

All three lawsuits name the United States as sole defendant. It is the theory of all plaintiffs that the two airplanes crashed while the pilots were following a mountain pass route marked on a sectional aeronautical chart known as the San Francisco Aeronautical Chart. Plaintiffs assert that while following the route on the sectional chart, the two pilots unknowingly entered the Center Basin blind canyon, and unable to navigate out of it due to the performance capabilities of their aircrafts, crashed into the canyon. The sectional chart is prepared and published by the Federal Aviation Administration (hereinafter referred to as the FAA), with some design work done by the National Oceanic and Atmospheric Administration. Plaintiffs allege that the United States, through its employees in these two agencies, are liable for the injuries and damage caused by the two crashes on the grounds that it negligently prepared, designed, printed, published, sold, supplied, maintained, reviewed, revised, updated, or failed to update, approved and controlled a sectional chart that was dangerous and unsafe to use, and failed to provide adequate warning and instruction on the proper use of the route.[2]

The United States now moves for summary judgment in all three cases, contending that even if it did commit the alleged acts of negligence, the acts come within the "discretionary function exception" to the Federal Tort Claims Act (28 U.S.C. §§ 1346(b), 2671–2680) and therefore cannot be the basis for the imposition of liability.[3]

On a motion for summary judgment, the party against whom the motion is asserted is entitled to the benefit of all favorable inferences, and summary judgment is proper only where there is no genuine issue of any material fact or where, when viewing the evidence and the inferences drawn therefrom in the light most favorable to the non-moving party, the moving party is clearly entitled to prevail as a matter of law. *People of State of California ex. rel. Department of Transportation v. United States*, 561 F.2d 731, 735 (9th Cir. 1977); *Driscoll v. United States*, 525 F.2d 136, 137 (9th Cir. 1975). In the present case the parties are in dispute as to the actual facts surrounding the controversy between them, therefore, to determine whether the United States is entitled to judgment as a matter of law, the Court is required to look at the evidence before it in the light most favorable to plaintiffs, and to assume the facts asserted by plaintiffs to be true. *Thompson v. United States*, 592 F.2d 1104, 1107 (9th Cir. 1979). In this light, the Court summarizes the relevant factual background below.

If a straight line is drawn between the San Francisco Bay Area and Las Vegas, Nevada, the line crosses the Sierra mountains over King's Canyon. Consequently, many pilots flying between these two locations choose to cross the Sierras at this point. As King's Canyon is the location of the Center Basin blind canyon, some of these pilots have become trapped in the Center Basin blind canyon.

1. Harwood was accompanied in the plane by his wife. Both sustained injuries. The Smith's insurer is being sued by Mrs. Harwood, and the complaint in the present action also contains a cause of action for indemnity and contribution for any sums recovered by Mrs. Harwood from plaintiff.

2. Plaintiffs' administrative claims were timely made, and denied, by the FAA and the National Oceanic and Atmospheric Administration.

3. The United States has failed to comply with the provision of Local Rule 220–7 of the United States District Court for the Northern District of California with respect to deposition testimony. This failure could justify denial of its motion, though the Court does not choose to rule on the motion on this basis.

A letter of a private citizen came to the attention of the Air Traffic Division of the Western Regional Office of the FAA which alerted the reader to the Center Basin blind canyon, and to numerous crashes that had occurred in the canyon. The citizen suggested that the danger of the canyon be noted on the sectional chart, and discussed at safety seminars. The citizen explained that in order to cross the Sierras over the King's Canyon area in a lower performance aircraft, either a northerly or southerly route must be taken around Mt. Bago. To the north of Mt. Bago is a narrow canyon, but this canyon provides a safe way over the range. To the south of Mt. Bago is a wide, inviting canyon, but this canyon can lead to Center Basin.

The citizen's letter came to the attention of Melvin Koehler, the assistant division chief for the Air Traffic Control Division of the Western Regional Office of the FAA. In January of 1979, when Koehler was acting as Acting Director of the division for the Western Regional Office in the absence of Director Frank Happy, Koehler decided to recommend that a mountain pass route over the Kearsarge Pass area be placed in the next edition of the San Francisco sectional chart. Koehler decided that such action should be taken so that pilots would have a route to follow around Mt. Bago that would prevent them from entering into Center Basin. Before making the recommendation, Koehler received information and a proposed route from his staff, and met with other FAA personnel. However, certain persons who should have been consulted about the proposed route were not, including the Accident Prevention Coordinator for the Western Region of the FAA.

Though he was not personally familiar with the Kearsarge Pass area, Koehler issued a letter recommending the charting of two alternative mountain pass routes over Kearsarge Pass. The letter was issued by Koehler in the name of his superior, Happy; Koehler had the authority to act on Happy's behalf. This recommendation was apparently approved, and the suggested routes sent to the National Oceanic and Atmospheric Administration where the actual cartography of the sectional charts is done. However sometime earlier, the hand drawing of the proposed routes prepared by FAA officials was lost, and a poor quality photographic copy substituted for use by the cartographers. On this copy, the proposed southern route around Mt. Bago was far more legible than the proposed northern route, so the cartographers put only the southern route on the sectional chart. As noted by the citizen in his letter, Center Basin is to the south of Mt. Bago.

Pursuant to Inter-Agency Air Cartographic Committee (IACC) specifications, the route was placed on the sectional chart with the use of blue diamonds. Blue diamonds are used to depict a mountain pass route. Mountain pass routes are not ordinarily depicted on sectional maps, and in fact the placing of the mountain pass route over Kearsarge Pass was the first time such a route had been placed on the San Francisco sectional chart. Additionally, a misleading elevation figure appeared over the route. It was not clear whether this figure applied to the elevation of the pass or to the elevation of the nearby peak, causing pilots not to have gained sufficient altitude to cross the ridge.

The mountain pass route appeared for the first time in the 19th edition of the San Francisco sectional chart. After publication, there was immediate opposition to the charting of the route because of its danger. Accidents occurred in the Kearsarge Pass area after publication of the chart. In response to the objections to the route, the route was removed from the 20th edition of the sectional chart. However, due to a mistake, the route again appeared on the 21st edition of the sectional chart. On the 22nd edition of the chart, the route was finally removed for good.

The United States asserts, in a rather simplistic fashion, that the acts of the government as they pertain to plaintiffs' lawsuits were the decision to chart a route over the Kearsarge Pass, and the choice of what that route would be. The United States contends that both of these acts are

discretionary in character, and so immunize the United States from liability. However, after a thorough reading of the complaints and the papers filed by plaintiffs in opposition to the government's motion, the Court feels that there are six distinct categories of acts allegedly committed by the government upon which plaintiffs base their theories of liability. These six categories are:

(1) *The decision to chart routes over the Kearsarge Pass area to be published on the San Francisco sectional chart.* Plaintiffs contend that there are numerous other, safer routes that are used by pilots to cross the Sierras, and that a crossing over the Kearsarge Pass area is probably the most hazardous of all routes. Thus, by the government's act of depicting only one mountain pass route on the entire sectional chart, the government acted negligently as it "implicitly authorized and recommended, what is in fact probably the most dangerous route available," (Plaintiffs' Opposition to Motion for Summary Judgment, p. 4), encouraging pilots to use this hazardous route over the Sierras.

(2) *The failure to warn of the Center Basin hazard.* Having recommended the most dangerous route to cross the Sierras to pilots, plaintiffs assert that the government was negligent in failing to warn pilots of the nearby hazard of Center Basin and to inform them that safer routes for crossing the Sierras were available.

(3) *The choice of where to chart the route over the Kearsarge Pass area.* Plaintiffs assert that the route chosen by the FAA officials to cross the Kearsarge Pass was negligently selected and that the chosen route did not safely cross Kearsarge Pass.

(4) *How the route was placed in the sectional chart.* Plaintiffs contend that due to the negligence of the government, the route which was chosen to cross at the Kearsarge Pass was not properly and accurately placed on the sectional chart by the cartographers,

and that the route on the sectional chart was inaccurate and misleading and not safe as depicted. Plaintiffs assert that the chart is inaccurate and misleading because: the proposed northern route was omitted from the chart; the elevation figure was dangerously misleading; the blue diamonds were not properly placed on the chart; and the chart failed to identify and explain symbols used to depict the route.

(5) *The failure of FAA officials to review the chart to be sure that the proposed routes had been accurately depicted.* Plaintiffs contend that FAA officials negligently failed to review the work of the cartographers before publication of the new sectional chart to ascertain whether the mountain pass route was accurately depicted as proposed.

(6) *Failure to warn pilots of the danger of the route, and failure to promptly remove the route from the chart, after publication of the chart and discovery of the hazards of the route.* The plaintiffs assert that when the government discovered the danger of the route after it was published, it had a duty to warn pilots of the danger. Plaintiffs also contend that the government had a duty to remove the route from the sectional chart in a timely fashion, and that the government negligently failed to do either.[4]

*General Principles Relative to Discretionary Function Immunity*

By the Federal Tort Claims Act Congress waived application of the sovereign immunity doctrine and authorized suits against the United States for the negligent or wrongful acts or omissions of its employees occurring within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omis-

---

4. As to these latter four categories of governmental acts, the United States continually asserts in its papers that the route depicted on the chart is safe. Plaintiffs contend otherwise, and this assertion clearly constitutes an ultimate fact, that if proved, would largely dispose of plaintiffs' claims. However, the United States has utterly failed to show that there is no triable issue of fact as to this ultimate fact. Thus, for purposes of this motion, it must be assumed that plaintiffs' asserted facts are true, and that the route as depicted is not safe.

sion occurred." 28 U.S.C. § 1346(b). However, Congress limits this broad authority for suit against the government by certain exceptions, including the discretionary function exception of 28 U.S.C. section 2680(a). The subsection provides that the United States does not consent to be sued with respect to

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or *based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.* 28 U.S.C. § 2680(a) (emphasis supplied.)

As with all cases addressing a particular application of the discretionary function exception to governmental conduct, discussion of the applicable case authority must begin with *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). From this case was born the "planning level" versus "operational level" analysis now commonly applied in discretionary function cases, the Court holding that in the case before it the decisions of the government upon which the petitioners sought to impose liability were within the discretionary function exception as "responsibly made at a planning rather than an operational level," and involving "considerations more or less important to the practicability" of a governmental program. *Id.* at 42, 73 S.Ct. at 971.

The Supreme Court refused to define the boundaries of discretion under the discretionary function exception, but did state that

> the 'discretionary function or duty' that cannot form a basis for suit under the Federal Tort Claims Act includes more than the initiation of programs and activities. It includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for poli-

cy judgment and decision there is discretion. *Id.* at 35–36, 73 S.Ct. at 967–68.

In the present case the United States relies almost exclusively on the *Dalehite* decision in support of its motion. However, the Ninth Circuit recognizes that subsequent decisions of the Supreme Court and of the circuit courts have narrowed the *Dalehite* statement on discretion, though the decision does retain importance as a statement of policy behind the discretionary function exception. *Lindgren v. United States*, 665 F.2d 978, 980 (9th Cir. 1982).

There is no single, clear, authority that has defined the limits of discretion under the exception, and accordingly courts have come to varying interpretations of the proper placement of these limits. The positions of the parties in the present actions as to what acts can constitute discretionary acts of the government represent the two ends of the continuum found in the body of case law.

The United States in essence contends that *any* discretionary act of the government comes within the discretionary function exception, and that the only acts of the government that are not immune are those exercised pursuant to a mandatory duty provided by statute, regulation, rule or otherwise. Plaintiffs contend that the discretionary function exception applies only to discretion exercised in connection with *significant* policy or political decisions. Though there is case law to support the positions of both parties, the Ninth Circuit test for determining whether an act of the government comes within the discretionary function exception, which this Court follows, is somewhere between the two.

The "prevailing test" in the Ninth Circuit is set forth in the recent case of *Lindgren v. United States*, 665 F.2d at 980, as follows:

> Not every discretionary act is exempt. Obviously, attending to many day-to-day details of management involves decisions and thus some element of discretion. The exercise of this kind of discretion does not fall within the discretionary function exemption. The distinction generally made in the application of the dis-

cretionary function exemption is between those decisions which are made on a policy or planning level, as opposed to those made on an operational level. *Thompson v. United States*, 592 F.2d 1104, 1111 (9th Cir. 1979). *See also Driscoll v. United States*, 525 F.2d 136, 138 (9th Cir. 1975). In addition to examining the level at which the act/omission occurred, this Court has also considered the ability of the judiciary to evaluate the agencies' act/omission and whether judicial evaluation would impair the effective administration of the Government. *See Driscoll v. United States, supra,* at 138.

 Thus, to determine whether an act does or does not fall within the discretionary function exception, the Court must look at the challenged act and determine whether the decision involved was made on a policy or planning level, *i.e.,* involved the evaluation of factors such as the financial, political, economic, and/or social effects of a given plan or policy, *Swanson v. United States*, 229 F.Supp. 217, 220 (N.D.Cal.1964), or whether the decision involved was made on an operational level, *i.e.,* involved the normal day-to-day operations of the government, though discretion may have been exercised. *Id.* The Court must also consider the ability of the judicial process to evaluate the decision made, and the affect on the effective administration of justice posed by this judicial evaluation of the decision. *Driscoll v. United States*, 525 F.2d 136, 138 (9th Cir. 1975).

The alleged acts of the government in the present case will now be discussed, applying applicable case authority.

(1) *Decision to chart a route.*

 Koehler's decision to place a mountain pass route over the Kearsarge Pass area on the San Francisco sectional chart was made to show pilots a way to cross this part of the Sierras without mistakenly entering into the Center Basin blind canyon. Decisions by FAA officials to place routes on the sectional charts are not made on a day-to-day basis, but rather are made infrequently; in fact, the mountain pass route over the Kearsarge Pass was the first mountain pass route to be placed on the San Francisco sectional chart. The decision to add the route was based upon considerations of public safety, after having been alerted to a natural hazard confronting pilots traversing the Sierra mountains.

The decision to add the route to the sectional chart is analogous to decisions: to build a lighthouse to warn vessels of land areas, *Indian Towing Co. v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955); to establish a control tower at an airport, *Air Transport Associates v. United States*, 221 F.2d 467, 471 (9th Cir. 1955); to establish safety flight procedures, *United Air Lines, Inc. v. Wiener,* 335 F.2d 379, 394, 395 (9th Cir.), *cert. dismissed,* 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964); to establish safety requirements for pilots and aircrafts, *see, e.g., Marr v. United States*, 307 F.Supp. 930, 931 (E.D.Okl.1969); and to control the bears in Yellowstone National Park. *Martin v. United States*, 546 F.2d 1355, 1360 (9th Cir.), *cert. denied*, 432 U.S. 906, 97 S.Ct. 2950, 53 L.Ed.2d 1078 (1977). All of these decisions have been found to be within the discretionary function exception and so exempt as bases for liability. Each decision was found to be discretionary as each involved considerations of policy, specifically, considerations as to the safety of particular members of the public. These same considerations of public safety lead to the decision in the present case to place a mountain pass route over the Kearsarge Pass area.

Plaintiffs would presumably have the Court find that the planning level boundary in this case ended at the point when the decision was made to permit FAA officials to add routes to the sectional charts, making all acts taken in pursuit of this power operational. But, as discussed above, the placement of routes on sectional charts were not common decisions. Such decisions were made only after consideration of the public safety and welfare. There is no authority in this circuit for the narrow interpretation of the discretionary function exception urged by plaintiffs.

Thus, the Court holds that the decision to chart a route over Kearsarge Pass, to be published on the San Francisco sectional aeronautical chart, though possibly not an exercise of good judgment, was a decision made at the policy or planning level, and not at the operational level. Thus the decision cannot be a basis for imposing liability upon the United States in this case. Even though there may well have been safer routes to recommend to pilots for crossing the Sierras, the decision to recommend this route was within the discretionary function exception. To hold otherwise could impair the effective administration of the FAA as there could be a chilling effect on FAA officials who should be free to make decisions affecting the safety of the public without fear or threat of lawsuits and personal liability. *Birnbaum v. United States*, 588 F.2d 319, 333 (2nd Cir. 1978).

Where, as in the present case, a decision-maker is not required by statute, rule or regulation to make a major safety policy recommendation, or has not undertaken to always make a major safety policy recommendation when a safety hazard is discovered, *cf. Driscoll v. United States*, 525 F.2d at 138, to permit such a decision to be reviewed for purposes of tort liability would cause the decision-maker to refrain from making such decisions for fear of personal liability, and this result would be more deleterious to the public safety than the individual negligence sought to be reviewed. As stated by the Court in *Birnbaum*, "the term 'discretionary function' was left obscure by Congress to permit judicial interpretations that will achieve substantial justice without a chilling effect on governmental action." *Birnbaum v. United States*, 588 F.2d at 333. In this case the Court must strike a balance in favor of finding that the decision to chart the route was a discretionary function.

■ It should be noted that both parties place emphasis on whether Koehler was a high ranking, or low ranking, official in support of their arguments as to whether he exercised a discretionary function in recommending the charting of the route.

Though the status of the decision-making employee may offer general guidance, it is not a sufficient test to determine whether a government employee's actions are within the discretionary function exception. *See, e.g., Downs v. United States*, 522 F.2d 990, 997 (6th Cir. 1975).

There is one possible basis for finding that the decision to add the route to the sectional chart was not within the discretionary function exception, and that is if the decision to chart the route was not within the scope or authority of Koehler or his agency. In *Birnbaum* the Second Circuit held that the discretionary function exception does not apply to a decision that is not within the scope or authority of the agency or official involved, because there can be no discretion to engage in unauthorized activities. *Birnbaum v. United States*, 588 F.2d at 329.

In the present case it is clear that Koehler had the authority of the chief of his division, Mr. Happy, in Happy's absence. To this extent, Koehler's acts were not unauthorized. However, there is a hint in plaintiffs' papers that his division, the Air Traffic Division of the Western Regional Office of the FAA, did not have the authority to recommend the charting of the route. As plaintiffs have offered no facts to the Court to support this position, the Court does not consider the mere hint to be sufficient to deny defendant's motion with respect to the act of deciding to chart a route over Kearsarge Pass. However, if plaintiff can assemble facts to show that this division had no authority to act as it did, plaintiff may move for reconsideration of this portion of the Court's ruling on these motions.

In conclusion, the Court finds that the decision to chart a mountain pass route over Kearsarge Pass was a decision within the discretionary function exception, and so cannot be a basis for the imposition of liability against the United States. The United States' motion for summary judgment is granted to this extent.

**(2) *Failure to warn on the sectional chart.***

Plaintiffs contend that once the government decided to place a mountain pass route over Kearsarge pass, allegedly the most hazardous route for crossing the Sierras, it then had the duty to warn pilots of the danger of nearby Center Canyon and to inform pilots that safer routes for crossing the Sierras were available by placing this information on the sectional chart. Plaintiffs conclude that the government's failure to do either constitutes actionable negligence.

Generally, a decision whether or not to warn of a natural danger, *i.e.,* a blind canyon, as opposed to one created by the government, *i.e.,* an electrical tower, is considered to be a discretionary function, that decision being based upon policy considerations such as public safety. But plaintiffs here are not asserting merely that the government should have warned pilots of the Center Basin blind canyon, but rather that under the unique facts of this case, the government had a duty to warn of the canyon in light of the *hazardous situation it created* that pilots would mistakenly enter the canyon while following the mountain pass route the government placed on the sectional map. This hazardous situation resulted from placing the route over the Kearsarge Pass because this route is the only mountain pass route on the sectional chart, so a pilot is led to believe it is the best route over the Sierras. The pilot therefore takes the route, and by taking the route runs a substantial risk of mistakenly entering Center Basin. Thus plaintiffs are contending that a warning is required as a result of a hazard created by the government.

■ It is well recognized that a duty to warn of a known danger or foreseeable hazard exists on the part of the government where the government has created that danger or hazard. *United States v. State of Washington,* 351 F.2d 913, 916–17 (9th Cir. 1965); *and see, e.g., Stephens v. United States,* 472 F.Supp. 998, 1009 (C.D.Ill.1979). A failure to warn does not necessarily assume the "discretionary cloak" of the decision which led to the creation of the hazard or danger. *Lindgren v. United States,* 665 F.2d at 982.

In *Lindgren v. United States* the Bureau of Reclamation allegedly artificially altered the flow, water level and riverbed configuration of an area of the Colorado river, creating a dangerous condition for users of the river due to the shallowness of the water. Plaintiff struck the river bottom in a shallow water area while water skiing and was seriously injured. The government had posted no warning of the dangerous water level conditions. *Id.* at 979. The Court of Appeal remanded the action for a determination of whether the failure to warn was a discretionary function, suggesting that where the need to warn arises out of a hazard created by discretionary acts such as in the case before it, rather than from the discretionary acts themselves (in that the discretionary acts directly produce damages). the failure to warn is not a discretionary function. *Id.* at 982. The Court also suggested that the failure to warn was discretionary because the placement of a warning would not be administratively burdensome since only some type of a "one-time" warning would meet the requisite standard of care. *Id.*

■ Both of these considerations are present in this case. The need to warn arises not out of the decision to chart a route, but out of the hazard created to pilots by charting the most dangerous mountain pass route on the sectional chart as the only mountain pass route on the chart. Additionally, the warning necessary to meet the requisite standard of care could have been done on a "one-time" basis, as all the warning that was required was a statement on the map warning of the hazards of the route and the dangerously close proximity of the blind canyon, telling pilots that other, safer, routes were available over the Sierras.

A case presenting a similar 'duty to warn because the plaintiff was attracted by the government to a hazard' situation was reported in *Smith v. United States,* 546 F.2d 872 (10th Cir. 1976). In that case the plain-

tiff was injured when he fell into a super-heated thermal pool in Yellowstone National Park. The pool was located in a field in an undeveloped portion of the park, and there were no warnings of caution at the pool, nor guardrails or boardwalks as were present in developed areas of the park. Of note, a paved, six car parking area was located adjacent to the field where the pool was located. The Tenth Circuit held that the government's decision not to warn of known dangers or to provide safeguards with respect to the thermal pool "cannot rationally be deemed the exercise of a discretionary function." *Id.* at 877; *and see Driscoll v. United States*, 525 F.2d at 138, (where the Ninth Circuit held that the government's decision not to install warning devices, barriers, speed control devices and cross walks on a road separating a building and its parking lot was operational); *El Paso Natural Gas Company v. United States*, 343 F.2d 145, 146 (9th Cir. 1965), (where the Ninth Circuit held that the United States had a non-discretionary duty to install warning devices on an obstruction it erected in such a manner as to constitute a trap).

On the basis of the above case authority, the Court holds that the government's decision not to place warnings on the San Francisco sectional chart of the proximity of the Center Basin blind canyon and the availability of safer routes to cross the Sierras was operational, and not made on the policy or planning level. Therefore the government is not immunized from liability based upon these failures to act. *Smith v. United States*, 546 F.2d at 877. The government's decision to place a sole mountain pass route over the most dangerous passage way in the Sierras created a severe hazard that pilots following the route might accidently venture into the Center Basin blind canyon. Failure to warn of this danger on the chart thus became not a policy level decision, but an operational level decision. The decision to warn is compelled by the actions of the government creating the hazard, and hence operational. In so holding the Court also finds that the Court is well able to evaluate whether the government's failure to act

was negligent pursuant to established tort principles, and further finds that such a judicial evaluation will not impair the workings of the FAA. A warning in this case would not be administratively burdensome as it would require only a one-time warning placed upon the sectional chart, and it is unlikely that permitting liability for such a failure to warn will significantly increase the number of lawsuits against the FAA, considering the relative infrequency of the depiction of mountain pass routes on the sectional charts. *See Lindgren v. United States*, 665 F.2d at 980, 982.

In conclusion, the Court finds that the decision not to place warnings on the sectional chart was not a decision within the discretionary function exception, and so can be the basis for the imposition of liability against the United States. The United States' motion for summary judgment is denied to this extent.

(3) *Choice of where to chart the route, and*

(4) *Inaccurate and misleading sectional chart.*

Plaintiffs contend that the route chosen by FAA officials to be placed on the sectional chart was negligently chosen and was unsafe, and alternatively, that even if the chosen route was safe, the route was not the route that was actually placed on the sectional chart and the negligence in the preparation of the sectional chart caused the chart to be inaccurate and misleading. Of these two claims, the inaccurate and misleading character of the chart is the more strongly urged by plaintiffs. Plaintiffs claim that the chart is inaccurate and misleading due to the decision of the cartographers to omit the northerly, and safer, of the two alternative routes charted by the FAA, due to the misleading placement of the elevation figure, and due to improper placement of the blue diamonds marking the route.

These alleged acts of the government are clearly of an operational character and so not within the discretionary function exception to liability. The decision of the

government to chart a mountain pass route over the Kearsarge Pass was what is known as a "Good Samaritan" act. The government voluntarily undertook to assist pilots to safely fly through the treacherous Kearsarge Pass area. When the government undertakes such a Good Samaritan task, thereby performing certain acts or functions and inducing reliance thereon, the government has a duty to perform the acts and functions with due care. *United Air Lines v. Wiener*, 335 F.2d at 396, 397; *and see Indian Towing Co. v. United States*, 350 U.S. at 64–65, 76 S.Ct. at 124. When this duty of care is discharged in a negligent manner, the government is guilty of negligence and it cannot escape liability by invoking the discretionary function exception, *Id.* at 69, 76 S.Ct. at 126, *Brown v. United States*, 374 F.Supp. 723, 728 (D.Ark.1974), for there is not discretion to conduct discretionary operations negligently. *United Air Lines, Inc. v. Wiener*, 335 F.2d at 393.

For example, where the government decides to build a drainage ditch, the building of the ditch must be done nonnegligently. The building of the ditch is an operational function and the government is not immunized from liability for its negligence. *Seaboard Coast Line Railroad Co. v. United States*, 473 F.2d 714, 716 (5th Cir. 1973). The discretionary function exception also does not apply to governmental acts of accepting a military aircraft that is negligently designed or constructed, *Moyer v. Martin Marietta Corp.*, 481 F.2d 585, 598 (5th Cir. 1973), or to governmental negligence in the design and installation of a modification to a military aircraft, *Swanson v. United States*, 229 F.Supp. at 221, the courts holding that such acts are operational.

■ In the present case, if in fact the government charted the route over Kearsarge Pass in a negligent fashion such that the route as charted was dangerous to fly, these charting acts cannot rationally be deemed an exercise of a discretionary function. The government cannot be permitted to act with impunity in the face of such negligence. The choice of where the route should be located was operational; acts of charting the course are similar to acts of design and construction. The cases cited above hold that such acts are operational.

In the case of *Thompson v. United States*, 592 F.2d 1104, the Ninth Circuit faced a case quite analogous to the present case. And though they appear in dicta, the court made statements that support the Court's decision here. In that case the Bureau of Land Management had granted a permit to an association allowing it to conduct a motorcycle race on federal land. A participant was injured, and sued the United States for negligent marking of the course for the race. *Id.* at 1106. Though the court found the decision to issue the permit was a discretionary act, the Court stated that *had* the government undertaken the responsibility to set out and mark the race course, such acts and decisions would have been operational, and not covered by the discretionary function exception. *Id.* at 1111.

The charting of a race course is nearly identical to the charting of a mountain pass route. Pursuant to the *Thompson* authority, the charting of the course for the mountain pass route over the Kearsarge Pass was operational. If done negligently, the government can be liable for injuries proximately caused by its negligence. And a court can readily determine whether there was negligence in charting the course of the route by applying established standards of care in the aeronautical industry.

The alleged negligence in the physical placing of the route on the sectional chart is also operational. The acts of the cartographers in physically placing the mountain pass route on the chart are true examples of day-to-day, operational level activities. Thus, the omission of the northerly route from the chart, the misleading placement of the altitude figure on the chart, and the misplacement of the blue diamonds on the chart, are all operational activities and the government can be liable for the alleged negligence.

■ Numerous cases hold that in connection with aeronautical charts prepared, published and disseminated by the government, the government has a duty to truly and accurately represent those features it at-

tempts to portray, and that discharge of this duty does not fall within the discretionary function exception. *Reminga v. United States*, 448 F.Supp. 445, 460 (W.D.Mich. 1978), aff'd, 631 F.2d 449, 458–59 (6th Cir. 1980). Accordingly, the government is liable for negligence in the preparation, publication and circulation of an erroneous or misleading sectional chart. *Allnutt v. United States*, 498 F.Supp. 832, 837 (W.D.Mo. 1980); *Sullivan v. United States*, 299 F.Supp. 621, 625–26 (N.D.Ala.1968), aff'd. 411 F.2d 794 (11 Cir. 1969). Thus, the government has been held liable for charting a television broadcasting tower on the wrong side of the railroad tracks than it was actually located, *Id.*; and for providing false and dangerously misleading runway lighting information on a sectional chart, *Murray v. United States*, 327 F.Supp. 835, 841 (D.Utah 1971), aff'd. 463 F.2d 208 (10 Cir. 1972). In the present case the government can be held liable for preparing, publishing and disseminating the allegedly inaccurate and misleading San Francisco sectional chart.

In making its rulings that the government can be liable for its alleged negligence in charting the route and in preparing the sectional chart, the Court finds that it is able to evaluate the alleged actions of the government by customary tort standards. Further, the Court finds that such evaluation will not impair the effective administration of the FAA and not subject it to an unreasonable number of lawsuits.

■ Until now the Court has not discussed plaintiffs' claim that the chart is also inaccurate and misleading because it fails to identify and explain the symbols used in the charting of the route. The use of charting symbols on sectional charts is extensively governed by IACC standards and specifications. Only if cartographers fail to follow these standards and specifications will the government be liable on an operational level because, if the inaccuracies and ambiguities are traceable to the standards and specifications (*i.e.*, the flaw in the chart is a flaw in the specifications), there is no liability because what is contained in the standards and specifications is deemed to be a discretionary function. *Baird v. United*

*States*, 653 F.2d 437, 440–41 (10th Cir. 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 1004, 71 L.Ed.2d 296 (1982) (inaccuracy of chart traced to the standards and specifications, so no liability); *Allnut v. United States*, 498 F.Supp. at 837 (inaccuracy of chart due to failure to follow the standards and specifications, so liability).

Plaintiffs have so far failed to show the Court that the cartographers failed to follow the IACC standards and specifications in failing to identify and explain the symbols used in charting the route. Thus, the United States' motion for summary judgment is granted in this limited respect, though if plaintiffs can assemble facts to show that the standards and specifications were not complied with, plaintiffs may move for reconsideration of this portion of the Court's ruling on the motion.

In conclusion, the Court finds that the choice of where to chart the mountain pass route over the Kearsarge Pass, and the allegedly inaccurate and misleading sectional chart, are not within the discretionary function exception, and so can be a basis for the imposition of liability against the United States. The United States' motion for summary judgment is denied to this extent.

(5) *Failure to review the chart.*

■ If, as alleged by plaintiffs, there was a duty incumbent upon officials of the FAA to review a sectional chart before it is published and disseminated to be sure that what was to be depicted was accurate, then the discharge of such duty was an operational function as within the normal day-to-day duties of the officials. Thus, the alleged negligent failure to perform this duty can be the basis for the imposition of liability against the United States. The United States' motion for summary judgment is denied to this extent.

(6) *Failure to warn pilots of the dangerous route, and to promptly remove the route, after publication of the sectional chart and discovery of the dangerous character of the route.*

■ For the same reasons discussed in section (2), these alleged acts of the govern-

ment are operational and a basis for the imposition of liability against the United States. The United States allegedly created a hazard which it allegedly failed to take proper steps to correct. The United States' motion for summary judgment is denied to this extent.

Thus, the Court will deny in part and grant in part the United States' motion for summary judgment, as stated in this Opinion. The Court notes that because the Court was required to rule on this motion based upon the facts most favorable to plaintiffs, the facts at trial may not support the theories of plaintiffs herein, and the discretionary function exception may apply to some or all of the acts of the government. If such facts do appear at trial, the United States may then move for judgment based upon the discretionary function exception. The Court also notes that the complaints of the plaintiffs do not allege some of the theories that they have asserted in their papers in opposition to the United States' motion for summary judgment. Plaintiffs should therefore move to amend their complaints to allege the theories they have asserted, and that have been accepted by the Court as being exempt from the discretionary function exception.

Good cause appearing therefor, IT IS HEREBY ORDERED that the United States' motion for summary judgment is GRANTED IN PART and DENIED IN PART in accordance with this Court's Opinion herein. IT IS FURTHER ORDERED that the parties appear for a status conference in this action on September 23, 1982, at 9:15 a. m.